UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

WILLIAM L. HUNTRESS,
ACQUEST DEVELOPMENT, LLC,
and ACQUEST TRANSIT, LLC

Plaintiffs,

v.                                                          **DECISION AND ORDER**
                                                            12-CV-1146S
UNITED STATES DEPARTMENT OF JUSTICE,
ERIC H. HOLDER, JR., in his official capacity as
Attorney General of the United States,
WILLIAM J. HOCHUL, JR., in his official capacity as
United States Attorney for the Western District of New York,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
LISA P. JACKSON, in her official capacity as
Administrator of the Environmental Protection Agency,
UNITED STATES DEPARTMENT OF DEFENSE ARMY
CORPS OF ENGINEERS, and LIEUTENANT GENERAL
THOMAS P. BOSTICK, in his official capacity as
Commanding General and Chief of Engineers, Army Corps of Engineers,

Defendants.

## I. INTRODUCTION

This is the fourth case before this Court that concerns property owned by Plaintiffs

located at 10880 Transit Road in Amherst, New York (the "property" or "Transit property")

and the Clean Water Act ("CWA"), 33 U.S.C. §1251 *et sec*.

In this case, Plaintiffs William Huntress and the two companies of which he is the

sole owner and member, Acquest Development LLC and Acquest Transit, LLC (collectively

Acquest"), seek (1) a declaratory judgment stating that the Transit property is not subject

to the CWA and, as a corollary, (2) an injunction, ordering the United States Government

to cease criminal prosecution and civil litigation against them for alleged CWA violations.

The Government has moved to dismiss this case, or, in the alternative, consolidate it with its separate civil enforcement action, described below.[1]

For the following reasons, Defendants' motion to dismiss or consolidate is granted in part and denied in part; Plaintiffs' motion for a preliminary injunction is denied; and their motion for a declaratory judgment is consolidated with Case No. 09-CV-055, converted into a motion for summary judgment, and denied.

## II. BACKGROUND

### A. The Clean Water Act

The Clean Water Act is at the center of both this case and the larger dispute between Plaintiffs and Defendants. Congress passed the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1331 (2013) (citing 33 U.S.C. § 1251(a)).

The CWA generally prohibits "the discharge of any pollutant" into "waters of the United States." 33 U.S.C. §§ 1311(a), 1362(7). But, as relevant here, the term "waters" is not limited to its traditional understanding. Rapanos v. United States, 547 U.S. 715, 731, 126 S. Ct. 2208, 2220, 165 L. Ed. 2d 159 (2006). For the purposes of the CWA, "waters of the United States" also encompasses, among other things, "interstate wetlands," 33 C.F.R. § 328.3(a)(2),(3), and "[w]etlands adjacent to waters . . . (other than waters that are themselves wetlands)," 33 C.F.R. § 328.3(a)(7).

---

[1]Aside from the conventional briefing on Plaintiffs' motion for a preliminary injunction and Defendants' motion to dismiss, this Court, at Plaintiffs' request, also permitted supplemental briefing. As such, both parties submitted briefs addressing issues that they deem ripe for review. (See Docket Nos. 36, 38, 41.) Oral argument was also held before this Court on March 18, 2013.

The CWA also establishes a permit system permitting certain discharges. Specifically, Section 402 of the CWA establishes the National Pollutant Discharge Elimination System, and grants the EPA the authority to "issue a permit for the discharge of any pollutant." 33 U.S.C. § 1342(a). The National Pollutant Discharge Elimination System "requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." <u>S. Florida Water Mgmt. Dist. v. Miccosukee Tribe of Indians</u>, 541 U.S. 95, 102, 124 S. Ct. 1537, 1541, 158 L. Ed. 2d 264 (2004). "In addition to federally-issued permits, Congress provided authority for States to issue N[ational] P[ollutant] D[ischarge] E[limination] S[ystem] permits for discharge into waters within its jurisdiction, provided that the State develops a permitting program and obtains approval for that program from the []EPA." <u>AcPeconic Baykeeper, Inc. v. Suffolk Cnty.</u>, 585 F. Supp. 2d 377, 412 (E.D.N.Y. 2008) (citing 33 U.S.C. § 1251(b)). In accordance with this provision, New York created the "State Pollutant Discharge Elimination System." <u>See</u> N.Y. Envir. Conserv. Law § 17-0801 (McKinney 2006). This program is administered by the New York State Department of Environmental Conservation. Plaintiffs have received two such permits from New York State, each are described in more detail below.

A different section of the CWA, Section 404, authorizes the Secretary of the Army, acting through the U.S. Army Corps of Engineers ("Corps"), to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." § 1344(a),(d); <u>see also</u> 33 C.F.R. § 323.1. Plaintiffs have not received any permits under Section 404.

## B.     Facts Leading to this Suit

Plaintiffs purchased the 96.6 acre property located at 10880 Transit Road in 2006. (Complaint, ¶ 24; Docket No. 1.) Since roughly 2007, Defendants here – various United States agencies and their directors – have consistently claimed and formally alleged that at least part of Plaintiffs' property is a "wetland" within the meaning of the CWA; that Plaintiffs have unlawfully discharged dredged or fill material into those wetlands; and that Plaintiffs have unlawfully discharged storm water pollutants in waters of the United States. For their part, Plaintiffs have consistently disputed that their land is subject to the CWA. In essence, they claim that the CWA is inapplicable to them because the property contains no "waters of the United States" (*i.e.,* it is not a wetland); because the property is subject to an exemption meant to exclude certain farm lands from CWA enforcement; and because they have received the necessary permits insulating them from any CWA violation. As noted, there are three other cases where some form of this dispute has been playing out. A brief description of them follows.

### 1.     <u>United States v. Acquest Transit, LLC</u>, No. 09-CV-055

▸     **The United States' Civil Case**

In this suit, commenced in January of 2009, the United States alleges that Acquest wrongfully discharged fill and pollutant material into waters of the United States without a permit.

On March 4, 2009, the United States moved for a preliminary injunction to enjoin Acquest from placing additional fill or performing additional earthmoving work at the property. This Court granted that motion on July 15, 2009, enjoining "Defendant Acquest

Transit LLC, its officers, agents, successors, employees, and others acting in concert with it . . . from placing additional fill or performing any additional earthmoving work at the Property designated as tax parcel 16.00-5-23 in the Town of Amherst, New York." (Decision and Order at 20; Docket No. 26.)

In May 2010, upon learning that Acquest was conducting activities on the property in violation of that Order, the United States filed a motion to enforce the preliminary injunction. After reviewing the evidence and testimony offered in support of the motion, Magistrate Judge Leslie G. Foschio recommended that this Court grant the United States' motion and award the United States reasonable attorneys fees and costs incurred pursuing the motion. (Docket No. 76.) This Court subsequently adopted the Report and Recommendation. (Docket No. 105.)

The case has not progressed much further from there, however, because the United States later brought a criminal case against Acquest, and as result, the action is currently stayed. (See Minute Entry; Docket No. 158.)

## 2. **United States v. Acquest Development, LLC, No. 11-CR-347**

▸ **The Criminal Case**

On November 9, 2011, a grand jury returned a seven-count indictment charging Huntress and Acquest with conspiracy, obstruction of justice, concealing a material fact, making a false statement, criminal contempt, and violations of the CWA.

Finding, however, that the grand jury heard improper evidence, Magistrate Judge Jeremiah J. McCarthy recommended dismissal of the indictment without prejudice. (Docket No. 35.) On March 25, 2013, this Court adopted that Report and Recommendation and

dismissed the indictment without prejudice. (Docket No. 59.)  As such, this case is now closed.

### 3.    <u>Huntress v. Mugdan</u>, No. 12-CV-559

▸   **Acquest's Civil Suit**

On June 15, 2012, Acquest (and an additional Acquest entity, Acquest Wehrle, LLC) initiated a civil suit against the United States Environmental Protection Agency ("EPA"), as well as six employees of EPA in their individual capacities. Acquest alleges that the EPA violated an injunction issued by the federal district court for the Southern District of Florida. Acquest asserts that the EPA acted arbitrarily and capriciously by, among other things, asserting jurisdiction over the Transit Property; instituting a civil enforcement action; instituting the criminal proceedings; and withholding certain evidence from a grand jury before the criminal indictment issued.

This case is ongoing, and currently there is a pending motion to stay by the United States. (Docket No. 22).

****

As noted, Plaintiffs have maintained all along that the Transit property is not subject to the CWA. But, according to them, none of these three other cases have yet presented an opportunity for them to litigate what they call the "threshold question" – whether the CWA applies to the Transit property. Accordingly, they brought this action with the hope of receiving (1) a favorable declaratory judgment answering this question and (2) a preliminary injunction that would effectively end the pending cases and preclude future CWA enforcement actions. Starting with the latter, this Court will address both requested forms of relief.

## III. DISCUSSION

**A.    Preliminary Injunction**

Plaintiffs seek to enjoin Defendants from proceeding with the current CWA enforcement action against them and initiating any future criminal suit.

The general standard for obtaining a preliminary injunction is well established in the Second Circuit:

> A party seeking a preliminary injunction must demonstrate "(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief."

N.A.A.C.P., Inc. v. Town of East Haven, 70 F.3d 219, 223 (2d Cir. 1995) (quoting Resolution Trust Corp. v. Elman, 949 F.2d 624, 626 (2d Cir. 1991)).

But "where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989).

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (internal citations and quotation marks omitted).

Plaintiffs essentially raise three arguments in an effort to demonstrate irreparable harm. First, they contend that, despite extensive litigation concerning the property at 10880 Transit Road, they have been deprived of due process. Second, they maintain that they are under a continuous threat of potential criminal prosecution. And third, they argue that they have been deprived of their property rights and are subject to the daily accrual of potential fines.

In support of their first argument, Plaintiffs rely principally, if not exclusively, on Sackett v. E.P.A., 132 S. Ct. 1367, 182 L. Ed. 2d 367 (2012).

When the EPA believes there is a violation of the Clean Water Act, it has two options: it can issue a compliance order or bring a lawsuit. See 33 U.S.C. § 1319(a)(3).

In Sackett, the EPA issued a compliance order, which compelled the Sacketts to engage in costly procedures to correct perceived problems associated with the development of their land. The Sacketts requested a hearing to dispute the order, but that request was denied. They then sought to bring a civil action challenging the EPA's order, arguing that the compliance order deprived them of "due process of law." But the district and circuit courts ruled against them. The Ninth Circuit found that the CWA "preclude[s] pre-enforcement judicial review of compliance orders," and that such preclusion does not violate the Fifth Amendment's due process guarantee. See Sackett v. E.P.A., 622 F.3d 1139, 1144, 1147 (9th Cir. 2010).

A unanimous Supreme Court reversed, holding that the Sacketts were entitled to "bring a civil action under the Administrative Procedure Act [] to challenge the issuance by the [] EPA of an administrative compliance order under § 309 of the Clean Water Act." Sackett, 132 S. Ct. at 1369.

Plaintiffs analogize this holding to this case, arguing that notions of due process compel an answer to the "threshold question" in each of the pending cases.

But any analogy from Sackett to this case is doomed from the start. The EPA did not issue a non-reviewable compliance order in this case; instead, it exercised its option to bring a civil suit. There can thus be no concern that Plaintiffs are being deprived of judicial review; to the contrary, they have it in spades – this is, after all, the fourth case on this subject being litigated in this Court. The Sackett Court itself recognized this pivotal distinction: "In Clean Water Act enforcement cases, judicial review ordinarily comes by way of a civil action brought by the EPA under 33 U.S.C. § 1319." 132 S. Ct. at 1372. Plaintiffs can contest the merits of the Defendants' case within the action pending against it (or, if it comes to it, a future criminal case); their due process rights have been, and will continue to be, vindicated in those forums. Indeed, both parties were before Magistrate Judge Foschio in March, at which time they each requested the stay in the United States' civil case to continue. (See Minute Entry; Docket No. 158 of 09-CV-055).

Plaintiffs' reliance on Sackett, and the Due Process Clause generally, is therefore misplaced.

Nor does this Court find that Plaintiffs' fear of future prosecution constitutes irreparable harm. See Steffel v. Thompson, 415 U.S. 452, 463, n. 12, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974) (citing cases and noting that in "cases where injunctive relief has been sought to restrain an imminent, but not yet pending, prosecution for past conduct, sufficient injury has not been found to warrant injunctive relief"). Indeed, in Younger v. Harris, the Supreme Court refused to grant an injunction on the basis of a feared state prosecution, holding that "[c]ertain types of injury, in particular, the cost, anxiety, and

inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable.'" 401 U.S. 37, 46, 91 S. Ct. 746, 751, 27 L. Ed. 2d 669 (1971). More recently and in a more similar context, the Court in <u>Hartford Associates v. United States</u>, 792 F. Supp. 358, 365 (D.N.J. 1992) refused to grant injunction on the basis of possible CWA criminal prosecution.

Cases cited by Plaintiffs do not compel a different result. In <u>414 Theater Corp. v. Murphy</u>, 499 F.2d 1155, 1162 (2d Cir. 1974), for example, the plaintiffs obtained an injunction in the course of challenging the constitutionality of a state statute that allegedly restricted their First Amendment rights. But unlike <u>Murphy</u>, this case does not involve the potential chilling of First Amendment rights, for which there is an exception to the general rule that courts should not enjoin criminal prosecution. <u>See Stolt-Nielsen, S.A. v. United States</u>, 442 F.3d 177, 183 (3d Cir. 2006) (citing <u>Dombrowski v. Pfister</u>, 380 U.S. 479, 486–87, 85 S. Ct. 1116, 14 L. Ed. 2d 22 (1965)). And, importantly, the CWA is not a state law. As the Court of Appeals for the District of Columbia has found:

> In no case that we have been able to discover has a federal court enjoined a federal prosecutor's investigation or presentment of an indictment. Of course, a federal prosecutor typically brings cases only in federal court, thereby affording defendants, after indictment, a federal forum in which to assert their defenses – including those based on the Constitution. Because these defendants are already guaranteed access to a federal court, it is not surprising that subjects of federal investigation have never gained injunctive relief against federal prosecutors.

<u>Deaver v. Seymour</u>, 822 F.2d 66, 72 (D.C. Cir. 1987); <u>see also</u> <u>Ali v. United States</u>, No. 12-CV-0816A SC, 2012 WL 4103867 (W.D.N.Y. Sept. 14, 2012) (Curtin J.) (noting that federal courts have applied the abstention doctrine articulated in <u>Younger</u> when asked to

enjoin enforcement of federal criminal proceedings).

Just as here, the plaintiff in <u>Deaver</u> feared he would suffer the "'continuing destruction of his business' 'injury to his reputation and dignity,' and 'the expenditure of substantial resources in his defense.'" 822 F.2d 66 at 68. But, "[i]t is clear that this type of harm does not rise to the level of "irreparable injury." <u>Id.</u> at 72 (Ginsberg, J., concurring).

Accordingly, in line with the great weight of authority, this Court finds that the threat of future federal prosecution is insufficient grounds on which to grant an injunction.

Finally, Plaintiffs' argument that an injunction is necessary to protect their property rights, including the use and enjoyment of their land, is similarly unavailing. Plaintiffs will be afforded a forum to litigate this concern if a criminal case is brought. Furthermore, the other cases pending before this Court, particularly the United States' civil case, also present Plaintiffs with an adequate forum to vindicate any unlawful deprivation of property. Indeed, the proper avenue for Plaintiffs to obtain the relief they desire is through the pending United States' civil case. There, they can move to lift the stay, and to vacate the preliminary injunction already in place. As discussed below, Plaintiffs will be granted leave to bring such a motion in that case.

Accordingly, finding that Plaintiffs have failed to demonstrate that they would suffer irreparable harm in the absence of injunction, this Court will deny their motion for a preliminary injunction.

**B.    Declaratory Judgment**

The Declaratory Judgment Act authorizes federal courts to render declaratory judgments in any "case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a) (1994). "'[I]t is well-settled that the trial court's decision to exercise declaratory jurisdiction

is a discretionary one.'" <u>Sheet Metal Div. of Capitol Dist. Sheet Metal, Roofing & Air Conditioning Contractors Ass'n, Inc. v. Local 38 of Sheet Metal Workers Int'l Ass'n</u>, 208 F.3d 18, 22 (2d Cir. 2000) (quoting <u>Broadview Chem. Corp. v. Loctite Corp.</u>, 417 F.2d 998, 1000 (2d Cir.1969)). In exercising its discretion, "[t]he Court . . . must look at more than just the mechanical application of the declaratory judgment standard." <u>Great Am. Ins. Co. v. Houston Gen. Ins. Co.</u>, 735 F. Supp. 581, 585 (S.D.N.Y. 1990). Instead, "[t]he Court must look at the litigation situation as a whole in determining whether it is appropriate for the Court to exercise its jurisdiction over the declaratory judgment action before it." <u>Id.</u>

Plaintiffs contend that there are three outstanding issues on which this Court could issue a declaratory judgment and which would end all CWA enforcement actions against them: (1) whether the property contains any "waters of the United States" as defined by the CWA; (2) whether Plaintiffs' Section 402 permits shield them from the reach of the CWA; and (3) whether the property, once determined to be "prior-converted cropland," can lose that designation through abandonment.

As an initial matter, this Court cannot rule on the first issue at this time because it presents a fact-intensive inquiry. The proper vehicle for its resolution continues to be through discovery and motion practice in the United States' civil action. Indeed, Magistrate Judge Foschio has already determined that "there has been no formal discovery in [the United States' civil action] pursuant to Fed. R. Civ. P. 26." (Decision and Order; Docket No. 89 of 9-CV-055). Once discovery is complete, and appropriate motions are filed, this Court can take the issue under advisement with all the facts before it.

What is more, this Court finds it would be improvident, if not erroneous, to exercise

its discretionary authority to issue a declaratory judgment. First, this motion essentially asks this Court to render an advanced ruling on an anticipated defense in the United States' civil case. Such a ruling "is not ordinarily a proper use of the declaratory judgment procedure." Hanes Corp. v. Millard, 531 F.2d 585, 592 (D.C. Cir.1976), *superseded by statute on other grounds*; see also BASF Corp. v. Symington, 50 F.3d 555, 559 (8th Cir. 1995) ("[W]here a declaratory plaintiff raises chiefly an affirmative defense, and it appears that granting relief could effectively deny an allegedly injured party its otherwise legitimate choice of the forum and time for suit, no declaratory judgment should issue"); It's Greek To Me, Inc. v. Varsity Brand, Inc., No. CIV.A. 11-1153-KHV, 2011 WL 6091752, at *2 (D. Kan. Dec. 7, 2011) ("Court may decline to hear a declaratory judgment action if plaintiff is using the action for procedural fencing . . . .").

Further, the Supreme Court has found that a "litigant may not use a declaratory-judgment action to obtain piecemeal adjudication of defenses that would not finally and conclusively resolve the underlying controversy." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 n. 7, 127 S. Ct. 764, 771, 166 L. Ed. 2d 604 (2007) (citing Calderon v. Ashmus, 523 U.S. 740, 749, 118 S. Ct. 1694, 140 L. Ed. 2d 970 (1998)). Such a case, the Court found, does not present an Article III "case or controversy." Calderon, 523 U.S. at 747. Although Plaintiffs contend that a declaratory judgment in their favor would end all CWA enforcement actions against them, this Court has already found that further discovery is necessary. Accordingly, even a ruling in Plaintiffs' favor would only be a piecemeal resolution, and would not "finally and conclusively resolve the underlying controversy." Id.

Nevertheless, both parties have agreed that the remaining two issues, central to each of the pending cases, are purely legal in nature and are ripe for decision by this Court. Recognizing that a speedy resolution of the purely legal questions of this case would reduce the complexity of this litigation for all parties, this Court finds it prudent to consolidate this aspect of the case with the United States' civil action and convert the motion for declaratory judgment into one for summary judgment. Defendants have indicated their willingness to this approach, suggesting that this Court direct the parties to submit cross-motions for summary judgment in the United States' civil case on the remaining legal issues. (Defs.' Br., Issues Ripe for Review, at 2; Docket No. 38.) This Court, however, finds the matter fully briefed and, in the interests of efficiency and expediency, will simply treat this motion as one for summary judgment and rule on it now. See, e.g., Landis v. North Am. Co., 299 U.S. 248, 254–55, 57 S. Ct. 163, 81 L. Ed. 153 (1936) (recognizing the "power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"); see also Flair Broad. Corp. v. Powers, 733 F. Supp. 179, 184 (S.D.N.Y. 1990) (quoting Holland Indus. v. Adamar of New Jersey, Inc., 550 F. Supp. 646, 648 (S.D.N.Y.1982)) ("[D]isputed 'legal questions present nothing for trial and are appropriately resolved on a motion for summary judgment.'").

**** 

Accordingly, there are  two issues on which this Court can now rule and which will have preclusive effect in each case to which they apply: (1)  whether Plaintiffs' Section 402 permits shield them from the reach of the CWA, and (2) whether the property, once

determined to be "prior-converted cropland," can lose that designation through abandonment.

### 1. Permits as Shields to CWA Enforcement

Under the regulatory framework of the CWA, a permit from the relevant state agency – in this case, the New York State Department of Environmental Conservation – is required if construction activity will result in "storm water discharge." <u>See</u> 40 C.F.R. §§ 122.26(a)(ii), (b)(14)(x), (b)(15)(i).

There is no dispute that Plaintiffs received two CWA Section 402 permits from the New York State Department of Environmental Conservation. This agency issued the first permit to Plaintiffs in 2006 for storm water discharges associated with the construction of a nursery on 3.9 acres of the Transit property. (Ex. 6 of second Cahoon Decl.; Docket No. 36-7.) In 2007, Plaintiffs received the second Section 402 permit for storm water discharge, this one associated with construction activities for up to 4 acres of the Transit property adjacent to the nursery location. (Ex. 8 of first Cahoon Decl.; Docket No. 29-8.)

Plaintiffs contend that these permits are a "*prima facie* defense to all CWA Section 1319 civil and criminal enforcement actions targeting the Transit Property." (Def.'s Br., Issues Ripe for Decision, at 5; Docket No. 36.) They maintain that these permits act as a shield against all enforcement actions brought under the CWA.

But to reach this conclusion, Plaintiffs make a hyper-textual, overly formalistic argument that defies the comprehensive nature of the CWA framework, and that ultimately cannot stand.

Plaintiffs rest their argument on Section 402(k), which provides that "[c]ompliance

with a permit issued pursuant to this section shall be deemed compliance for purposes of section[s] 1319 . . [and] . . . 1311." 33 U.S.C. § 1342(k).

Eighteen U.S.C. §1311 is the codification of Section 301 of the CWA, which simply makes the discharge of any pollutant unlawful. Section 1319 is the enforcement provision of the CWA, authorizing the commencement of civil actions in federal court. Accordingly, it is under these sections that Defendants have brought the United States' civil case.[2]  In that case, the United States (through the authority of the Attorney General and at the request of the EPA) has charged Plaintiffs with the discharge of "both fill material and storm water runoff" violations. Section 402 of the CWA authorizes the EPA to issue permits for the latter and Section 404 authorizes the Corps to issue permits for the former. 33 U.S.C. § 1342; 33 U.S.C. § 1344.

Plaintiffs contend that the "plain language" of Section 402(k) – which states that compliance under that section is considered compliance for purposes of enforcement – *completely* shields the Transit property from any CWA enforcement action, regardless of whether the material at issue is covered under Section 402 or 404. In other words, according to Plaintiffs, any permit, issued for any purpose, bars the Government from exercising any authority under the CWA on the property.

But this is plainly at odds with the statutory scheme of the CWA. Sections 402 and 404 authorize different agencies to issue permits for different materials. The Supreme Court has recognized this distinction. "Section 402 gives the EPA authority to issue permits

---

[2]Thomas Bostick and the Corps are not plaintiffs in the United States' civil suit.

for the discharge of any pollutant, with one important exception: the EPA may not issue permits for fill material that fall under the Corps' § 404 permitting authority," wrote Justice Kennedy. Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261, 273, 129 S. Ct. 2458, 174 L. Ed. 2d 193 (2009). The EPA's own regulation provides that "[d]ischarges of dredged or fill material into the waters of the United States which are regulated under section 404" "do not require [EPA Section 402] permits." 40 C.F.R. § 122.3. And that is plainly because they require *Section 404* permits. See 33 U.S.C. § 1344; Couer Alaska, 557 U.S. at 274 ("The Act is best understood to provide that if the Corps has authority to issue a permit for a discharge under § 404, then the EPA lacks authority to do so under § 402.").

Despite Congress' clear intent to distinguish these two types of permits by assigning them entirely different sections in the law, Plaintiffs' interpretation of the statutes and relevant regulations reads out any distinction between them and the types of discharges they authorize. This is discordant with settled principles of statutory interpretation. See, e.g., United Sav. Ass'n v. Timbers of Inwood Forest Assocs. Ltd., 484 U.S. 365, 371, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) (noting that "[s]tatutory construction . . . is a holistic endeavor" and that often only one permissible meaning "produces a substantive effect that is compatible with the rest of the law"); FCC v. NextWave Personal Commc'ns, Inc., 537 U.S. 293, 311, 123 S. Ct. 832, 154 L. Ed. 2d 863 (2003) (Breyer J., dissenting) ("It is dangerous . . . to rely exclusively upon the literal meaning of a statute's words divorced from consideration of the statute's purpose."). Here, it is clear that the language of Section 402(k) is limited to compliance for the purposes of that section, and does not give a permit

holder under that section unrestricted liberties with respect to the remainder of the CWA's regulations.

Cases cited by Plaintiffs are not to the contrary.[3] These cases stand for the proposition that a Section 402 "permit holder is in compliance with the CWA even if it discharges pollutants that are not listed in its permit, as long as it only discharges pollutants that have been adequately disclosed to the permitting authority." <u>Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.</u>, 268 F.3d 255, 268 (4th Cir. 2001). But each of these cases concern Section 402 pollutants, not Section 404 dredge or fill material. None of these courts hold, as Plaintiffs urge this Court to do, that a Section 402 permit shields its holder from the violations contemplated by Section 404.

Plaintiffs are therefore not shielded from all CWA enforcement by dint of their two Section 402 permits.

Still, that does not end the matter entirely. Plaintiffs are, after all, also charged with storm water violations – the type of violation that a Section 402 permit would protect against. But it is not clear at this time whether the alleged violations fit within the geographic scope of the 2006 and 2007 permits. Defendants contend that storm water violations occurred outside of the permit area, and the permits, therefore, offer no protection. In any event, this issue too would be better understood with further discovery, and this Court will refrain from ruling on it now.

---

[3]<u>Coon ex rel. Coon v. Willet Dairy, LP.</u>, 536 F.3d 171, 173 (2nd Cir. 2008); <u>Sierra Club v. ICG Hazard, LLC</u>, No. 11-148-GFVT, 2012 WL 4601012, at *9 (E.D. Kentucky Sept.28, 2012); <u>United States v. Tennessee Gas Pipeline Co.</u>, No. 91-1428, 1993 WL 594155, at *4 (W.D. Louisiana Apr. 14, 1994).

## 2.    Continuing Validity of the Abandonment Rule

The second issue ripe for decision implicates the CWA's exemption of "prior-converted croplands." Lands that qualify as prior-converted croplands, or wetlands converted to farming prior to December 23, 1985, are categorically excluded from the definition of "waters of the United States" and are therefore beyond the jurisdiction of the CWA. 40 C.F.R. § 230.3(s), 33 C.F.R. § 328.3(a)(8); see 7 C.F.R. § 12.2.

In 1987, the Soil Conservation Service determined that approximately 67.7 acres of the Transit Property "contained hydrolic soils [that] were converted [to farming] prior to" December 23, 1985. (Wetland Conservation Determination, Ex. A of Complaint; Docket No. 1-1.) These acres were, in other words, prior-converted cropland; about this there is no dispute. It is not surprising then that Plaintiffs argue that a large portion of the Transit property is not subject to the CWA.

But the implementing regulations also provide that such a designation can be lost if the land is not used for farming purposes for five consecutive years. As explained in the relevant Federal Register preamble, the EPA and Corps excluded prior-converted croplands "to ensure consistency in the way various federal agencies are regulating wetlands."  58 Fed. Reg. 45008, 45034 (August 25, 1993). In this vein, the agencies used the abandonment provisions set out by the Soil Conservation Service – an arm of the United States Department of Agriculture ("USDA") that is now called the National Resources Conservation Service – and applied them to the CWA. Id. Specifically, the Register provides:

The Corps and EPA will use the S[oil] C[onservation] S[ervice]

> provisions on "abandonment," thereby ensuring that P[rior] C[onverted] cropland that is abandoned within the meaning of those provisions and which exhibit wetlands characteristics will be considered wetlands subject to Section 404 regulation. . . . In particular, P[rior] C[onverted] cropland which now meets wetland criteria is considered to be abandoned unless: For once in every five years the area has been used for the production of an agricultural commodity, or the area has been used and will continue to be used for the production of an agricultural commodity in a commonly used rotation with aquaculture, grasses, legumes or pasture production.

Id.

Thus, under both the National Resources Conservation Service's and the EPA's regulations, when land has been abandoned for a continuous five-year period, as the Transit property arguably was, it loses any prior exemption from the CWA that it may have once had.

Yet this still does not settle the matter. Plaintiffs, argue that, even assuming the land was abandoned,[4] the abandonment rule was repealed by the 1996 amendments to the Food Security Act, and is no longer in effect.

By way of background, the Food Security Act was enacted in 1985 and is administered by the United States Department of Agriculture's Natural Resources Conservation Service – the same agency with which, in the interests of consistency, the EPA and the Corps aligned their abandonment rule. 16 U.S.C. §§ 3801-3862. The Act regulates federal benefits for farmers and contains provisions intended to discourage farming on converted wetlands. 16 U.S.C. §§ 3821-24. These disincentives are commonly

---

[4]Plaintiffs also argue that the land was in fact never abandoned. But this a fact-intensive inquiry, and cannot be answered on the basis of limited discovery.

referred to as the "Swampbuster" provisions of the Act. Id. For example, the Act generally prohibits loans or payments to any person who produces an agricultural commodity on a wetland that was converted to a cropland after 1990.[5] 16 U.S.C. § 3821(c).

The 1996 amendment is significant here because it provides that:

> No person shall be adversely affected [for taking] an action based on a previous certified wetland delineation. The delineation shall not be subject to a subsequent wetland certification or delineation, unless requested by the person.

16 U.S.C. § 3822(a)(6).

In adopting regulations to implement this law, the Natural Resources Conservation Service and the USDA have characterized the change this way: "Once a PC, always a PC." 61 Fed. Reg. 47019, 47021 (September 6, 1996). The USDA explained that the amendments were intended to "revise[] the concept of 'abandonment' to ensure that as long as land is used for agriculture, a certified prior converted cropland designation remains in effect." 61 Fed. Reg. 52664, 52669 (Oct. 7, 1996). Thus, the provision on abandonment to which the EPA and the Corps had based their rule has been altered; in fact, Plaintiffs argue, it has been eliminated.[6]

---

[5]The original date was December 23, 1985, when the Food Security Act was first enacted. See PL 99–198 (HR 2100), PL 99–198, December 23, 1985, 99 Stat 1354.

[6]Defendants dispute that the abandonment principle has been written out of the law. Section 3822(b)(1)(G) of the Act provides that if, "as a result of lack of maintenance, management or circumstances beyond the control of the person," the "Secretary determines the wetland characteristics returned after" December 23, 1985, the farmer will maintain subsidies – but only so long as he is producing "agricultural commodity" on those wetlands. Thus, Defendants argue, converted status can still be lost if farming ceases. See 61 Fed. Reg. 47019, 47020 (amendment "[e]nsures that wetlands that were certified as prior-converted cropland will continue to be considered prior-converted cropland even if wetland characteristics return . . . *provided the prior-converted cropland continues to be used for agricultural purposes*") (emphasis added). But because this Court finds that the Food Security Act does not affect the CWA, this dispute is irrelevant.

Consequently, Plaintiffs argue that abandonment is no longer a recognized concept in either the context of federal farming benefits or CWA enforcement; and therefore, the 1987 cropland determination controls even if farming was discontinued on the Transit property.

For several reasons, this Court cannot agree.

First, Congress authorized the EPA, not the USDA, to issue rules implementing the CWA.  33 U.S.C. § 1251(d); City of Milwaukee v. Illinois & Michigan, 451 U.S. 304, 311, 101 S. Ct. 1784, 1789, 68 L. Ed. 2d 114 (1981). Acting under that authority, the EPA promulgated its *own* rule that mirrored that of the National Resource Conservation Service and the USDA. See 58 Fed. Reg. 45008, 45034 ("In particular, P[rior] C[onverted] cropland which now meets wetland criteria is considered to be abandoned unless . . . ."). It is inconsequential that the USDA's rule was subsequently amended by statute. In other words, simply because the rule on which the EPA based its own rule was changed, does not, *ipso facto*, render the EPA's rule changed.

Indeed, the regulations implementing the CWA recognize this and caution that, although the EPA fashioned a rule identical to that of the USDA, the EPA retains "ultimate statutory responsibility for determining the scope of CWA jurisdiction." 58 Fed. Reg. 45008-01, 45033; 33 C.F.R. § 328.3(a)(8) ("[F]or the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA.").

Further, there is no indication that Congress intended to alter the EPA's rule through the Food Security Act. If anything, the opposite is true: the Food Security Act was narrowly tailored and specifically designed to leave the CWA and its implementing regulations as

they were. As an initial matter, although the Act is designed to discourage farming on wetlands, it does not regulate the discharge of pollutants or fill material on those lands – that is squarely within the province of the CWA. Second, if there were any doubt, the legislative history "state[s] with particular clarity," that Act was not intended to interfere with the CWA. See United States v. Farhane, 634 F.3d 127, 143 (2d Cir. 2011) (looking to a particularity clear passage in a House Conference Report for guidance on Congressional intent). The House of Representatives Conference Report here states that Congress "intend[s] that the amendments to abandonment provisions under swampbuster *should not supersede* the wetland protection authorities and responsibilities of the Environmental Protection Agency or the Corps of Engineers under Section 404 of the Clean Water Act. The minimal effect amendments are intended by [Congress] to assist persons in avoiding a violation of the ineligibility provisions of [the Food Security Act] . . . ." H.R. Conf. Rep. No. 104-494, at 380 (1996) (emphasis added).

Finally, although case law on this issue is sparse, at least one other court has reached the same conclusion.[7] Just as in this case, the Defendant in United States v. Cam "argue[d] that the [1996 Food Security Act] amendments did away with the concept of abandonment." No. 3:05cr141, Opinion and Order, at 27 (D. Or. Dec. 21, 2007) (unpublished). But the court disagreed: "That may be true for purposes of any farm subsidies defendant may seek, but it is not true for purposes of the CWA." Id.

---

[7]Defendants also rely on United States v. Righter, where the court applied the abandonment principle to reject the defendant's claim that his land should be considered prior-converted cropland. No. 1:08-CV-0670, 2010 WL 2640189 (M.D. Pa. June 30, 2010). It appears, however, that the 1996 amendments to the Food Security Act were not raised as a defense, and the court certainly did not discuss them.

Despite Plaintiffs' reliance on New Hope Power Co. v. U.S. Army Corps of Engineers, 746 F. Supp. 2d 1272 (S.D. Fla. 2010), there appear to be no cases supporting Plaintiffs' position. In New Hope, the court found that a different Corps rule – called the "Stockton Rule" – "create[d] a second exception, in addition to abandonment, whereby prior converted croplands can lose their exempt status." Id. at 1282. Ultimately, the court ruled that this new rule was "procedurally improper because no notice-and-comment procedures were used." Id. at 1284. It plainly did not reject the EPA's and Corps' abandonment rule. If anything, it ratified it by suggesting that the new Stockon Rule was invalid because it differed from the longstanding abandonment rule.

Accordingly, context, legislative history, and case law establish that the EPA's abandonment rule is unaffected by the 1996 Food Security Act amendments.

**** 

One final matter requires this Court's attention. Plaintiffs correctly note that the Code of Federal Regulations does not explicitly mention abandonment; rather, it provides only that "[w]aters of the United States do not include prior converted cropland." 33 C.F.R. § 328.3(a)(8). The definition of "prior-converted cropland" and the provisions on abandonment are left to be developed in the Federal Register.

Relying on Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 539 (D.C. Cir. 1986), Plaintiffs contend that because the provisions on abandonment are published only in the Federal Register, and not the Code of Federal Regulations, they constitute

unenforceable policy statements.[8]

    In <u>Brock</u>, then-Judge Scalia seemed to suggest as much, finding that "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations." 796 F.2d at 539. But a closer reading reveals that this language was not meant to suggest that everything published in the Federal Register is policy; it was instead meant to convey the converse, that nothing in the Code is policy. And, further, this language should not be isolated from the remainder of the opinion. <u>See, e.g.</u>, <u>Marbury v. Madison</u>, 1 Cranch, 137, 2 L.Ed. 60 ("It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used."). In <u>Brock</u>, the court went on to note that the United States Department of Labor believed the policy in question could *not* be a final rule and that the Secretary "took pain to exclude the enforcement guidelines from the final rule[,] . . . direct[ing] that they not be published with the rule in the Code of Federal Regulations." <u>Brock</u>, 796 F.2d at 539. There is no evidence of such efforts or belief in this case. To the contrary, the EPA has long understood its rule on prior-converted croplands to contain an abandonment provision.

    What is more, the distinction between the Code and the Register was only one criterion weighed by the court. It principally took guidance from the Attorney General's Manual on the Administrative Procedure Act, which defines general statements of policy as "statements issued by an agency to advise the public prospectively of the manner in

_____

[8]Plaintiffs do not argue that the EPA lacked authority to institute such a rule, only that, in publishing it only in the Federal Register, it did not do so.

which the agency proposes to exercise a discretionary power." Id. at 537; see also Chrysler Corp. v. Brown, 441 U.S. 281, 302 n. 31, 302, 99 S. Ct. 1705, 60 L. Ed. 2d 208 (1979) (noting that the Supreme Court has given some weight to the Attorney General's Manual in prior cases).

But unlike the statement in Brock, the abandonment provision here is not precatory or tentative; it does not leave room for discretion in its application, and it does not offer simply suggested protocol. Rather, in being devoid of these characteristics, it has all the hallmarks of a rule. Even cases on which Plaintiffs rely recognize as much, and characterize the Federal Register as delineating a "joint final rule." See New Hope, 746 F. Supp. 2d at 1276, 1282 (citing 58 Fed. Reg. 45008-001, 45033) ("In the related final rule by the EPA and the Corps, the only means for this status to be lost is abandonment, which requires the land to revert to a present wetlands state"); see also United States v. Hallmark Const. Co., 30 F. Supp. 2d 1033, 1038 (N.D. Ill. 1998) (citing the Register to define "prior-converted cropland").

Thus, contrary to Plaintiffs' argument, a complete and enforceable rule is created when the Code of Federal Regulations, which excludes prior-converted croplands from the definition of "waters of the United States," is read in conjunction with the Federal Register, which defines "prior-converted croplands" and subjects them to abandonment. See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 158, 102 S. Ct. 3014, 3025, 73 L. Ed. 2d 664 (1982) (looking to the preamble for the administrative construction of the regulation); Chico v. Schweiker, 710 F.2d 947, 954 (2d Cir. 1983) (relying, in part, on Federal Register preamble); La Environmental Action Network v. United States, 172 F.3d

65, 69 (D.C. Cir. 1999) (reading EPA's language in Federal Register preamble together with EPA regulation).

Because that rule was not altered by the Food Security Act, the Transit property's status as a prior-converted cropland – however encompassing that may be –  is subject to the EPA's provisions on abandonment.

## IV. CONCLUSION

Plaintiffs motion for a preliminary injunction is denied because they have not demonstrated irreparable harm. Further, because this Court finds that discovery is essential to several issues raised by Plaintiffs, the proper venue for their resolution continues to be found in the United States' civil case. Consequently, a discovery management order will issue in the United States' civil case and Plaintiffs will be granted leave to bring a motion to vacate the preliminary injunction in place there.

In the interests of efficiency, however, this Court does find that two purely legal issues can be decided at this time. After consolidating this case with the United States' civil action and converting Plaintiffs' motion for declaratory judgment into one for summary judgment,  this Court finds that Plaintiffs' two Section 402 permits do not act as a shield against all CWA enforcement and that the Transit property's status as a "prior-converted cropland" is subject to the EPA's and the Corps' provisions on abandonment. Acquest's converted summary-judgment motion is therefore denied.

## V. ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' motion for a preliminary injunction (Docket No. 2) is DENIED

FURTHER, that Defendants' motion to dismiss or consolidate (Docket No. 23, 30) is GRANTED in part and DENIED in part.

FURTHER, that the Clerk of Court shall consolidate the remainder of this case with Case No. 09-CV-055.

FURTHER, that Plaintiffs' motion for a declaratory judgment (Docket No. 1) is CONVERTED into one for summary judgment; that motion is DENIED.

FURTHER, that a status is set before Magistrate Judge Leslie G. Foschio on June 12, 2013 at 2:00 p.m. for the purpose of lifting the discovery stay in Case No. 09-CV-055 and setting a discovery scheduling order.

FURTHER, that, after the close of discovery in Case No. 09-CV-055, Plaintiffs are GRANTED leave to file a motion to vacate the preliminary injunction or move for summary judgment, or both, on the remaining issues.

FURTHER, that the Clerk of Court is directed to close this case.


Dated:     May 24, 2013
           Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                            Chief Judge
                                     United States District Court